## HANCOCK INSPIRATOR Co. *v.* JENKS.

*(Circuit Court, E. D. Michigan.* February 11, 1884.)

1. PATENTS FOR INVENTIONS—AMENDED APPLICATION—VERIFICATION—ACT OF 1836.

    Where a patent, issued on a supplementary or amended application, under the act of 1836, upon its face recites that "the patentee has made oath to his application," this recital, in the absence of fraud, is conclusive evidence, in a suit against an infringer, that the necessary oath was taken by the applicant before letters patent were granted.

2. SAME—COMBINATION—CLAIMS.

    The claims for a combination patent need not include any elements except such as are essential to the peculiar combination and are affected by the invention.

3. SAME—CONSTRUCTION OF CLAIMS.

    While a patentee is limited by his claims, courts are allowed to look at the detailed specifications, models, or drawings, for the purpose of construing such claims.

4. SAME—UTILITY OF DEVICE—INFRINGEMENT.

    In a suit for infringement, that plaintiff's device is a useful one is sufficiently shown by the fact that, with other devices open to him, defendant prefers to use the mechanism patented by plaintiff.

5. SAME—HANCOCK BOILER INJECTOR—PATENTABILITY—ANTICIPATION—INFRINGEMENT.

    Letters patent No. 86,152, granted January 26, 1869, to John T. Hancock, for an improvement in boiler injectors, construed, and *held,* that the device therein described was a patentable invention, not anticipated by prior devices, and that the first and second claims thereof are infringed by the "duplex injectors" manufactured, sold, and used by defendant.

    Per BROWN, J.

6. SAME—REHEARING—RUE PATENT.

    On rehearing, and comparison of the Hancock and Rue patents, *held,* that the latter did not anticipate the Hancock injector.

    Per MATTHEWS, Justice; BROWN, J., concurring.

In Equity.

This was a bill to recover damages for an infringement of letters patent No. 86,152, dated January 26, 1869, to John T. Hancock, for an improvement in boiler injectors. The bill recited, in the usual form, the grant of letters patent, the introduction into general use of the patented device, both by the patentee and the plaintiff, the assignment of the patent to the plaintiff, the infringement of the same by the defendant in the manufacture, sale, and use of "duplex injectors," so called, and prayed for an account, a decree for profits and damages, and for an injunction. The answer denied, for various

reasons, the validity of the plaintiff's patent, and also the infringement by the defendant.

*Elmer P. Howe* and *Chauncey Smith*, for plaintiff.

*T. S. Sprague*, for defendant.

BROWN, J.   The main object of all boiler injectors is to raise water by means of a vacuum, created by the condensation of steam, and to force the water so raised into the boiler from which the steam originally issued.   The general construction of all these devices is much the same.   The principal features of each are common to all.   They consist of an upright tube, through which the water is raised into a chamber at the top, in which a vacuum is created; a second tube at right angles to the first, provided with a conical nozzle of small diameter, through which the steam is driven with great velocity against the water rising from the first tube.   The effect of the steam-jet is— *First*, to produce a vacuum in the chamber, about the nozzle, which is filled by the uprising water; and, *second*, to drive this water into the boiler.   In so doing it is itself condensed, and returns with the water to the boiler, from which it issued.   The success of these devices is dependent very largely upon the separation, as far as possible, of the water and steam up to the very point where they come in actual contact.   The maximum of efficiency is attained when the jet of steam retains the same temperature which it had when it issued from the boiler, and when the water to be acted upon is as cool as possible.   The pressure, and consequently the velocity, of the propelling jet of steam is then at its maximum.   In both injectors and ejectors, which differ from each other mainly in the use to which they are put, and not materially in their construction, the jets may be reversed; that is, the steam may take the place of the water in the annular chamber, and a jet of water be propelled through the conical nozzle.   In all devices prior to the plaintiff's, the water was allowed to circulate for a greater or less distance about the nozzle through which the steam rushed.   The effect of this was twofold: *First*, to cool the steam somewhat before it left the nozzle, and thereby diminish its velocity; and, *second*, to heat the water, and thereby diminish its condensing power after it came in actual contact with the steam.   To remedy this defect was the object of Hancock's invention, which consists principally in substituting, for the conical nozzle ordinarily used, a plate or plug with an orifice, and some other trifling changes incidental thereto.   In the specifications the device is described as follows:

"In the drawings, A A represent a cylinder, with induction pipe, B, at right angles with A, the pipe, B, being connected with the source of power. C is a concentric tube, smaller than A, which is placed within, and firmly attached at one end to A.   The bore of this tube, C, is conical from *d* to *e* and from *d* to *g*.   E is a plug closely fitted into A at the end opposite C.   This plug has a central, conical orifice, K, which presents an area at its inner face similar in size to the area of tube, C, at *d*.   This plug is provided on its inner face with the annular recess, *n, n*, thus providing a passage-way for the motor

to the bore of tube, C. The face of tube, C, at *e* is in the same plane with the edge of orifice, K, in plug, E, or nearly so. When the plug, E, is in position in cylinder, A, as shown, the annular recess, *n*, *n*, on its face becomes a continuation of the space, *m*, *m*, which surrounds tube, C."

The claims of the inventor are:

(1) The combination of plug, E, with orifice, K, and the tube, C, with the chamber, *e d*, when they are located relatively to each other, substantially as described; (2) the plug, E, with orifice, K, and tube, C, with the chamber, *e d*, and chamber, *d g*, as described; (3) the combination, with the above, of the tube, D, substantially as described.

Defendant is charged with infringing the first two claims.

A preliminary objection was taken to the validity of the patent, upon the ground that it appeared from the records of the patent-office that the supplementary or amended application upon which the patent was granted was verified, not by the oath of the patentee, but by that of his attorney. Section 6 of the act of 1836, under which this patent was granted, provides that the patentee shall deliver a written description of his invention or discovery in full, clear, and exact terms, and shall particularly specify and point out the improvement which he claims as his own invention or discovery. The descriptions and drawings shall be signed by the inventor and attested by two witnesses. The same section also requires that the applicant shall make oath that he does verily believe himself to be the first inventor or discoverer of the art, machine, composition, or improvement for which he solicits the patent. It has apparently become the practice for an attorney acting for the inventor, if the claims of the latter are rejected from any cause by the commissioner, to examine the case in view of the reasons given for such objection, and amend the specifications and claims without the knowledge of the inventor, and request a re-examination. The seventh section of the same act, after defining the duty of the commissioner in case he rejects an application, enacts that "if the applicant, in such case, shall persist in his claims for a patent, with or without any alteration in his specification, he shall be required to make oath or affirmation anew, in manner as aforesaid." It is argued in this connection that all these mandatory provisions of the act must be complied with before the commissioner of patents can take jurisdiction in the case. But conceding that the commissioner has no authority to receive the oath of the attorney to the supplementary application, there are two answers to the proposition that the patent is thereby rendered void:

(1) There is nothing in the act requiring this oath to be in writing, and, notwithstanding the existence of the supplementary application, verified by the attorney, it is possible that the patentee appeared personally before the commissioner and made the requisite oath in his presence. The commissioner, having general jurisdiction of the subject, is presumed to have complied with all the requirements of the law before issuing the patent. Indeed, the courts have gone so far as to

hold that the presence in the files of the patent-office of a paper pur-
porting to be an oath, but void for want of a jurat, will not defeat
the patent. Walker, Pat. § 122; *Crompton* v. *Belknap Mills*, 3 Fisher,
536; *Hoe* v. *Kahler*, 12 Fed. Rep. 117. (2) We have always under-
stood that the judgment of a court having jurisdiction of the parties
and of the subject-matter, or the decision of an officer acting judi-
cially, could not be impeached collaterally by showing that such judg-
ment was rendered or judicial act performed upon insufficient testi-
mony, or was even procured by fraud and perjury. So far as this
principle is applied to the judgments of a court of record the authori-
ties are very numerous. Freem. Judgm. §§ 334–338; Big. Estop. 145,
151; *Simms* v. *Slacum*, 3 Cranch, 300; *Ammidon* v. *Smith*, 1 Wheat.
447; *Smith* v. *Lewis*, 3 Johns. 157; *Marriott* v. *Hampton*, 7 Term
R. 269; *Michaels* v. *Post*, 21 Wall. 398. It is scarcely less fre-
quently applied to the action of a public officer exercising judicial
functions, as in granting patents. *Abbott* v. *Bahr*, 3 Chand. (Wis.)
193; *Jackson* v. *Lawton*, 10 Johns. 23; *Rubber Co.* v. *Goodyear*, 9
Wall. 789.

But we think that further discussion of this proposition is ren-
dered unnecessary by the opinion of the supreme court in *Seymour*
v. *Osborne*, 11 Wall. 516, 539. In this case it was claimed that the
patent was void because the patentees did not make oath, before the
patent was granted, that they did verily believe that they were the
original and first inventors of the improvements for which the patent
was solicited. The court treated the requirements of the law with
regard to the delivering of the written description of the invention,
and of the manner and process of making, constructing, and using
the same, as conditions precedent to the right of the commissioner
to grant the application, as they must appear on the face of the pat-
ent, and are always open to legal construction as to their sufficiency.
The same remark was made with regard to the drawings and models;
and the further requirement that the inventor shall make oath that
he is the original and first inventor, etc. But Mr. Justice CLIFFORD
winds up this branch of the case by observing "that extended exami-
nation of the question, however, is unnecessary, as every one of the
letters patent on which the suit is founded contains the recital that
the required oath was taken before the same was granted; and the
court is of opinion that those recitals, in the absence of fraud, are
conclusive evidence that the necessary oaths were taken by the ap-
plicants before the letters patent were granted." Now, in the case
under consideration, the patent upon its face recites that "the pa-
tentee has made oath to his application;" and we are clearly of
the opinion that we are not at liberty to inquire into the truth of this
statement in a suit against an infringer.

In the case of *Childs* v. *Adams*, 1 Fisher, 189, the bill itself recited
the fact that the patentee, who was an alien, had falsely represented
himself as a citizen in order to obtain a patent. Eight years after-

wards he surrendered the patent, and made oath that he was a citizen of France, and obtained a reissue which recited that the original patent was granted to him upon his belief that he was a citizen of the United States, which belief arose from ignorance of the laws of the United States. As the defect in the jurisdiction of the commissioner was thus brought directly before the court upon the plaintiff's own allegation in the bill, of course the court could not avoid taking judicial notice of the fact that the commissioner had no authority to grant the original patent, because of the false suggestion, and of the reissue, because of want of power in the commissioner to grant it eight years after the invention had been in public use.

In *Eagleton Manuf'g Co.* v. *West, etc., Manuf'g Co.* 2 FED. REP. 774, the patentee died after his original application was made; but he authorized his attorneys to amend the application. At his death their authority ended. They made the amendments in his name without any authority in fact, when the amendment should have been made by his administratrix. This, apparently, appeared upon the face of the patent, and it was held to be fatal. We do not think this case in point, as plaintiff's patent is entirely regular upon its face.

The next objection taken to the Hancock patent is that the claims are for mere aggregations of elements, which, by themselves, perform no duty or functions; that they must of necessity, to compel them to operate or perform any functions of an injector or ejector, be combined and arranged with something else besides the elements named as being combined in either of the claims. In the examination of defendant's expert, he gives it as his opinion that the combination would not be operative for any use or purpose without the addition to them of an induction tube and a chamber to inclose the tube, C. Now, while it is entirely true that the combination stated in these claims would be obviously inoperative without such induction tube and chamber, still, by adding these elements, the construction would be equally inoperative without a boiler to furnish the steam and a well to supply the water, and a pipe leading to and from the boiler. But, in drawing the claims for a combination patent, we do not understand it to be necessary to include any elements except such as are essential to the peculiar combination, and are affected by the invention. Other portions of the machine are usually shown in the drawings to exhibit their relation to the patented combination, and they are wholly unnecessary to the validity of the claims. Indeed, it is manifest that the more elements introduced into the combination, the easier it would be to evade the patent; since, to sustain a suit for infringing a combination, it must be made to appear that the defendant used every element of such combination, however immaterial it may be. *Vance* v. *Campbell*, 1 Black, 429.

In this patent the patentee has claimed all that he has invented, and if he had added more it would have been something which was

already well known and necessary to its operation, and therefore implied in his claim. While, as observed by Judge BLODGETT in *Dennis v. Cross*, 6 Fisher, 138, 141, "probably no principle of patent law is better settled than that the patentee is limited by his claim;" courts are allowed to look at the detailed specifications, models, or drawings for the purpose of construing such claims.

In *Forbush v. Cook*, 2 Fisher, 668, it is said by Mr. Justice CURTIS that "it is not requisite to include in the claim for a combination, as elements thereof, all parts of the machine which are necessary to its action, save as they may be understood as entering into the mode of combining and arranging the elements of the combination." So, in *Loom Co. v. Higgins*, 105 U. S. 580, it was held that, if an improvement of a well-known appendage to a machine is fully described in a specification, it is not necessary to show the ordinary modes of attaching the appendage to the machine. The letters patent are to be read as if the machine and its appendage were present, or in the mind of the reader, and he is a person skilled in the art. "If a mechanical engineer invents an improvement on any of the appendages of a steam-engine, such as the valve-gear, the condenser, the steam-chest, the walking-beam, the parallel motion, or what not, he is not obliged, in order to make himself understood, to describe the engine, nor the particular appendage to which the improvement refers, nor its mode of connection with the principal machine."

It is usual in the drawings to show the relations of the patented combinations to the other portions of the machinery, but the patentee is not obliged and ought not to claim anything more than such portions of the combinations as are essentially a part of his invention.

We are satisfied, too, that this combination, slight as its apparent departure from other devices is, involves an exercise of the inventive faculty. It consists in substituting, for the ordinary nozzle used in injectors, a plate with an orifice, K, designed to project into the steam-chamber, but not sufficiently far to allow the temperature of either the water or steam to be perceptibly affected either by the other before they meet at the mouth of the combining tube; and in this particular it is obviously different from, if not more valuable than, the other patents which are claimed as anticipations. In the Giffard patent the projection of the nozzle into the chamber is about one and a quarter inches, in the Barclay patent one inch, and in the Rue patent five-eighths of an inch, while in the Hancock patent it is less than one-sixteenth of an inch. This result is obtained by a construction so different from that adopted in prior devices, that we consider it to be patentable. We think, too, by reference to the drawings, this peculiarity of construction of the plug, E, is made sufficiently manifest to support the claim in the language in which it is couched.

There are numerous patents set up as anticipations of the plaintiff's, but the steam-nozzle used in the original Giffard patent, or some other similar device which permits the circulation of water about the

steam-jet, is an element in all, and in that respect they fail to accomplish what is claimed for the plaintiff's patent. Undoubtedly the field upon which Hancock was experimenting to produce his device was, considering the existing state of the art, a pretty narrow one.

All of the prior devices contained nozzles which closely corresponded with the plug, H, and its orifice, A, a chamber, a combining tube with two conical frustrums, and had it not been for the new result produced, it would be difficult to avoid the conclusion that Hancock had been anticipated by prior patents; in other words, that his device was nothing more than a mechanical variation. But that the result he produced was a valuable one is evident from the Barclay patent, wherein the patentee surrounds his steam nozzle by an envelope or casing, leaving a free space between the outside of the nozzle and its casing, which may be filled with any non-conducting substance. In his specifications, Barclay states the object of surrounding the steam-nozzle with its non-conductor of heat is to maintain a high temperature of the steam until it reaches the exit from its nozzle, as "priming" (by which we understand the condensation of steam) is very injurious whilst forming the vacuum. In all the other devices the water and steam were carried parallel to each other for some distance before coming in contact, and thereby the steam was perceptibly cooled and its injecting force weakened, while in the Hancock patent the steam and water approach each other from opposite directions up to a point only one-sixteenth of an inch from the point of actual contact, so that neither has any perceptible effect upon the other until the union takes place.

That the duplex injector used by the defendant is an infringement of the Hancock patent is apparent upon the most casual inspection, and indeed is scarcely denied by the defendant himself. It is, in fact, a duplication of the plaintiff's invention, and consists of an ejector or lifting apparatus, which, by the action of a jet of steam, raises the water from its reservoir, and, after discharging it into the combining tube, delivers it to a second apparatus at right angles to the first, by which it is injected into the boiler. The construction of the injector and the ejector is substantially the same, and each is evidently taken from the plaintiff's patent. The only perceptible differences between them are that the lower surface of the plug, E, is in this device somewhat more recessed than in the Hancock patent, and that the diameter of the combining tube at its throat, d, is not exactly similar in size to the inner diameter of orifice, K. These changes are quite immaterial; indeed, they are probably accidental. The orifice, K, in this device is also made considerably longer than in the plaintiff's patent; but that does not seem to affect in any way the separation of the inflowing steam and water before they reach the combining tube, which is the essence of the Hancock patent.

That the plaintiff's device is a useful one is sufficiently apparent from the fact that, with other devices open to him, the defendant

prefers to use the mechanism patented by the plaintiff. *Smith* v. *Glendale, etc., Co.* 1 Holmes, 340; *Lehnbeuter* v. *Holthaus*, 105 U. S. 94.

Upon the whole we are clearly of the opinion that plaintiff is entitled to a decree for an injunction, and for a reference to a master to assess its damages.

---

OPINION AFTER REHEARING.

(June 25, 1884.)

MATTHEWS, Justice, (*orally.*) In the matter that was argued before us yesterday, *Hancock Inspirator Co.* v. *Jenks*, we are prepared to dispose of the application, made by the defendant in the original suit, upon a single point arising in the progress of the cause, involving a comparison between the patent sued upon, of Hancock, and a patent which it was thought had anticipated it, called the Rue patent. The order granting the rehearing confined the argument to the issue raised by the motion, viz.: that the court, in its former opinion, was in error as to the construction and mode of operation of the patent of Samuel Rue, dated September 1, 1868; that said patent was an anticipation of plaintiff's patent; and that plaintiff's patent was void for want of patentability, and was invalid. This did not open the whole question of patentability and validity arising on all the evidence in the case, but only so far as it arose out of this comparison between the Rue patent and the Hancock patent, so that the question is a narrow one, and involves simply a comparison between the inventions secured by these two patents. The patent to Hancock, which is the subject of the suit, after describing the previous forms of apparatus for the purpose of injecting water into the steam-boilers by means of the steam, in the specifications makes this statement:

"When steam is substituted for water as the motor in such apparatus, it is evident that the heat in contact with the shorter tube will cause the inclosed or enveloping matter to become of a higher temperature as it advances towards the point where the motor can first act upon it, and thereby the motor becomes less effective than it would be were there a greater difference in temperature between the two; that is, the motor and the body or liquid to be acted upon."

This describes a defect which had been presented to the minds of previous patentees. The injector consisted of two tubes placed axially in a line with each other, through one of which the steam was suffered to enter, and which penetrated into the chamber, which was filled with water drawn from another source, for the purpose of propelling that water through the second tube into the boiler; and the difficulty foreshadowed in this connection, and which had been presented to the minds of previous patentees, was that the steam-tube was projected into the water-chamber to such an extent as that the jet of steam was subject to condensation, and so to a diminution of

its propelling or motive power to drive this water through the other tube into the boiler. In one case, Barclay's patent, the inventor sought to obviate that difficulty by packing his steam-tube with a casing of non-conducting material, such as asbestos.

Now the statement in Hancock's specification shows that what was present in his mind was the difficulty arising in the operation of this apparatus from two bodies—the steam, which was the motive power, and the water, which was the thing to be moved—coming prematurely into such contact as to diminish the motive power of the steam to condense or to carry the body where it ought to be propelled through the other tube into the boiler. Therefore he had presented to his mind the method of constructing some arrangement in this apparatus by which the temperature in the two bodies would be kept as far as possible from each other; the heat in the steam to be preserved, and the water to be kept cold. He therefore goes on to say: "The principal change which I made in the ancient apparatus is at this point, and it consists in substituting a plate with an orifice for the tube,"—that is, the tube intended for the introduction of one of the two elements,—"and some simple but essential changes which will now be described." He then proceeds to describe what is exhibited in the drawings connected with his patent; the arrangement of the plate with the orifice, called a plug, with the tube through which the steam propels the water into the boiler, (of course, these two were to be used for the purpose indicated,) with the means of holding the water which is drawn into it for the purpose of being propelled through the second of these tubes. The construction given to the patent was that it was a combination of those two elements, of course to be used for the purpose indicated, and implying the existence of this water-chamber; so that the objection taken that the water-chamber is not mentioned as one of the necessary elements of the combination is not before us, inasmuch as it was passed upon before by the court in construing this patent.

Now, there is nothing in the patent of Rue, so far as the specifications and claims are concerned, which suggests the idea which is contained in the patent of Hancock. His patent was for a totally different invention. But the argument is that his drawings exhibit, in point of fact, the very device which constitutes the change indicated by Hancock in his patent as the point intended to be covered by it, viz., a shortening, a withdrawing of the projection attached to the stem of the pipe so as to prevent its immersion in the water chamber except to the minimum amount; and although it is admitted that in those drawings the projection is shown to be longer than in Hancock's, yet that is only a question of degree, and the idea of overcoming the defect in that way having been suggested in the Rue patent, the increased efficiency to be attained by a diminution of the projection of the steam-tube into the water chamber was only a question of mechanical skill, and I think we are both of the opinion (and

that is admitted by counsel upon the other side) that, if that were the only difference between the invention shown in the drawings connected with the Rue patent and the patent of Hancock, the argument would be well taken, and that is, that adopting the idea contained in a former patent, and, merely by a contraction of the parts, increasing the efficiency in pursuance of some suggestion, would not be an invention; but we are of opinion that Hancock's patent goes beyond that, and that is the precise difference between counsel. It is claimed on the part of the defendant that it is the sole difference. It is claimed on the other side that it is not the sole difference, but that the difference consists, not in the mere withdrawal of the nozzle of the steam-tube from the water-chamber by contracting it, by diminishing its length, by cutting it off, but it is by a removal of the water-chamber from its position, which it occupied in the previous devices as being contained between the two tubes equally, so that the water-chamber, being pushed further from the steam-tube, incloses and envelopes the mixing-tube where the steam and water combine, and thus serves, not only the purpose of preventing the condensation which would occur by its contact with the steam-tube, and so diminishing the power and effect of the steam-jet, but promotes the rapid condensation which does take place there, and which it is intended to carry out there, and which, by a more rapid creation of the vacuum promoted by the steam, permits the rush of water into the mixing-tube, and so gives greater vigor to the effect of the jet of steam. So it operates in a double way, by withdrawing its cooling effect upon the steam-jet and transferring it to the other tube, where it ought to be. We think there is a sufficiently clear and explicit description of the arrangement of those devices contained in the Hancock patent to distinguish it from all patents previously obtained, including that of Rue, and that the combination has no reference especially to the greater or less length of the nozzle of the steam-tube, but to the arrangement of the tubes in connection with the water-chamber so as to bring that chamber opposite to and inclosing the tube where the steam and water mix, and the steam is condensed, and away from the other. We are clear in this opinion. Judge BROWN coinciding in it, (it being his original opinion,) and as he has heard nothing in the argument tending to shake his conviction, the original decree is affirmed, and will be entered.

BROWN, J. Counsel will recollect that on the original hearing of this case the argument covered a much larger field than the rehearing, involving questions not only as to the validity of the patent upon its face, and its probable anticipation by the Rue patent, but questions as to the regularity of the proceedings in the patent-office; and while, of course, I considered all these points in delivering the original opinion, I must say that upon the application for a rehearing, where all the stress was laid upon one point, I was somewhat shaken

in my previous convictions. At the same time, if the question had been reargued before myself alone, I should have affirmed the original decree, upon the ground that a rehearing before the same judge will not be granted unless he is clearly of opinion that he was mistaken in his original judgment; hence I thought it a proper case to call upon the circuit justice to resolve my doubts. I am entirely content, upon the rehearing, with the opinion originally announced. I confess I am not able, speaking as one who is not practically acquainted with mechanics and machinery, to see the great benefit of this apparatus over the other, the improvement being largely in the shortening of the tube; at the same time, the burden of proving that is upon the defendant, and it is a burden which I apprehend would be a pretty difficult one to carry, in view of the large sales made by the plaintiff in this suit, and the adoption by the defendant of this device in preference to all others. I think that is very strong evidence that there must be a superiority, in the minds of experienced engineers, in the Hancock patent, and I think there is, in respect to its mechanism and the details mentioned by the circuit justice, quite a marked distinction between it and the Rue patent.